UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PROTECTIVE LIFE INSURANCE COMPANY,
                          (Terminated)

         Plaintiff,

   v.                                                                  Case No. 08-C-312

B&K ENTERPRIZES LLC
and MEGAN ANN HANSEN,

         Defendants.

and

ROBERT K. STEUER, ASSIGNEE FOR THE
BENEFIT OF CREDITORS OF B&K
ENTERPRIZES LLC,

         Intervenor.

## DECISION AND ORDER

Protective Life Insurance Company ("Protective") commenced this interpleader action pursuant to Rule 22 of the Federal Rules of Civil Procedure in order to resolve competing claims to the proceeds of a $1 million policy of insurance ("the Policy") it issued on the life of Richard McDonald, who killed himself on or about February 23, 2008. The competing claimants are B&K Enterprizes LLC ("B&K"), the original owner of the policy, and Megan Hansen, McDonald's girlfriend. Protective deposited the proceeds of the policy with the Court and has since been terminated from this litigation, leaving B&K and Hansen to litigate their respective claims to the proceeds. In addition, Robert K. Steuer, Assignee for the benefit of the creditors of B&K, has

intervened and seeks avoidance of the alleged transfer of ownership of the Policy to McDonald as a fraudulent transfer.

The Court has jurisdiction under 28 U.S.C. § 1332 since complete diversity existed at the time the complaint was filed. Although Protective, a citizen of Alabama and the sole non-citizen of Wisconsin, has been dismissed, this does not divest the Court of jurisdiction. *See Freeport-McMoRan Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991) (per curiam) ("We have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events.") The matter is currently before me on three motions: B&K's motion for declaratory judgment and motions for summary judgment by Hansen and the Assignee, all predicated on essentially undisputed material facts. For the reasons stated below, the Court grants B&K's motion for declaratory judgment and denies Hansen's. The Assignee's motion for summary judgment will be denied as moot.

## I. BACKGROUND

B&K was formed as a Wisconsin Limited Liability Company on September 10, 2003, by McDonald and a partner to develop, build, own and operate a gas station and convenience store in Manitowoc, Wisconsin. Additional members joined thereafter. McDonald was the manager of B&K and ran B&K's gas station and convenience store from the time it opened sometime in 2004 until he was removed by the other members of the LLC on October 19, 2007, for misappropriation of funds. At the time B&K was formed, McDonald was considered the "key man" in the development and operation of the business B&K intended to establish. B&K was thus required by its lenders to purchase a policy insuring McDonald's life as a condition of the financing they

2

provided. Subject to an assignment of the proceeds to secure payment of its loans, B&K was the sole beneficiary of the policy.

Following McDonald's removal as manager, it became clear that the business was failing. The LLC members decided to sell off the assets of B&K, but before they could do so, they were forced to make substantial contributions in order to pay off the debt secured by the assets. McDonald, who owned the largest percentage of the LLC, made no contribution to the effort. By that time, McDonald had become involved in a relationship with Megan Hansen, a friend of his ex-wife's daughter. Indeed, B&K records show that a small amount (less than $600) of the money McDonald misappropriated was used to purchase a gift for Hansen and a motorcycle for her brother, though Hansen claims her brother reimbursed McDonald for the purchase of the motorcycle. McDonald was also in the process of getting a divorce, and since April of 2007, had been living in a room at the Birch Creek Inn.

As the company was winding down, McDonald attempted to acquire the B&K Policy insuring his life and make Hansen the beneficiary. The premium was paid through March 1, 2008, and in early January, McDonald approached Gerald Braun, the independent agent who sold the policy to B&K, to inquire about naming Hansen as the beneficiary. B&K was apparently planning on letting the policy lapse. Braun's office contacted Protective about the change of beneficiary and was told that only the policy owner could change the beneficiary. Braun conveyed this information to McDonald, who then left a voicemail for Michael Culligan, the newly installed B&K manager, and asked him to call Braun. Culligan did so, and Braun told him that McDonald wanted to take over ownership of the policy and was requesting that Culligan sign a form changing the ownership to him. Culligan assumed that this meant that McDonald would pay the premium when it became due in March and that ownership of the Policy would transfer to McDonald at that time.

3

On January 31, 2008, Braun took the change of ownership form and change of beneficiary form to meet with McDonald at the Birch Creek Inn. McDonald signed both forms, acknowledging the change in ownership of the Policy from B&K to himself, and directing that the beneficiary be changed to Hansen. Later the same afternoon, Culligan came to Braun's office and signed the change of ownership form as B&K's "operating manager." Culligan was not shown and had no knowledge of the change of beneficiary form that McDonald had signed. Braun witnessed both forms and later inserted the language "B&K Enterprizes, Inc." below Culligan's signature on the change of ownership form. He then mailed both forms to Protective, first the change of ownership form, and then, approximately a week later, the change of beneficiary form.

Christalyn Cline, a supervisor in Protective's Policy Holder Services Department, received the change of ownership form on February 4, 2008, and noticed immediately that the owner of the Policy was listed (albeit incorrectly) as B&K Enterprizes, Inc, a corporation. When a Policy is owned by a corporation, Protective requires that the change of ownership form contain signatures of two corporate officers. Cline therefore rejected the change of ownership form and returned it to B&K on February 19, 2008, with instructions that the form be returned to Protective with the signature of a second B&K officer. B&K did not return the form, and according to Protective's records, B&K remains the owner of the Policy.

The change of beneficiary form signed by McDonald and naming Hansen as the beneficiary was received at Protective on February 11, 2008, by Catrina Felton, who started her employment with Protective in the Policy Holder Services Department five months earlier. Felton simply assumed McDonald was the owner of the Policy and, after comparing his signature with one on file, accepted and processed the change of beneficiary form, even though B&K was still listed as the

4

owner of the Policy on Protective's records. On February 13, 2008, Protective mailed a letter approving the change in beneficiary to B&K. The letter approving the change was passed on to McDonald.

Meanwhile, sometime in early February 2008, McDonald gave Hansen his cell phone, his truck and the title to the truck and asked her to sell the truck to cover expenses and keep the proceeds for herself. He also gave her a note, which stated, "Megan, sell truck, use money til policy kicks in. . . . I'll tell you what has to be paid, rest you keep." (Hansen Dep. Ex. 7 at B&K 113.) Hansen was aware that McDonald had named her as the beneficiary of the policy. (Hansen Dep. 36:20-22, 37:1-14.)

On February 22, 2008, Hansen returned the cell phone to McDonald at the hotel. In the early morning hours of February 23, 2008, Hansen received a series of 11 telephone calls from McDonald. (B&K's PFOF ¶ 69.) She took at least one of these calls and told McDonald to leave her alone. (*Id*.) McDonald committed suicide early in the morning of February 23, 2008, by ingesting windshield washer fluid and toilet bowl cleaner. (*Id*. at ¶ 70.) His body was discovered on February 25, 2008. (*Id*.) On March 5, 2008, Hansen called Protective to confirm that she was the beneficiary of the policy. (*Id*. at ¶ 75.) On March 25, 2008, Culligan submitted a claim to Protective for the proceeds of the policy on behalf of B&K. (*Id*. at ¶ 74.)

## II. ANALYSIS

A federal court sitting in diversity applies the substantive law of the State in which it is sitting. *Allstate Ins. Co. v. Keca*, 368 F.3d 793, 796 (7th Cir.2004). Both parties agree that Wisconsin law applies here. Under Wisconsin law, insurance policies are interpreted according to

5

the same general principles of law that govern contract construction. *Marotz v. Hallman*, 2007 WI 89, ¶ 34, 302 Wis. 2d 428, 734 N.W.2d 411. The objective is to discern and give effect to the intent of the parties. *Id.*, *Sprangers v. Greatway Ins. Co.*, 182 Wis. 2d 521, 536, 514 N.W.2d 1 (1994). The words of a policy of insurance are to be given their common and ordinary meaning. *J.G. v. Wangard*, 2008 WI 99, ¶ 22, 313 Wis. 2d 329, 753 N.W.2d 475. When the language used in the policy is ambiguous, *i.e.*, reasonably susceptible of two different meanings, the ambiguous language should be construed against the insurer and in favor of coverage. *Badger Mutual Insurance Co. v. Schmitz*, 2002 WI 98, ¶ 51, 255 Wis. 2d 61, 647 N.W.2d 223; *Danbeck v. American Family Mutual Insurance Co.*, 2001 WI 91, ¶ 10, 245 Wis. 2d 186, 629 N.W.2d 150.

Under the terms of the Policy, only the Owner had the authority to change the beneficiary. The Policy defined Owner as "the person who owns this policy, as shown on the Company's records." (McMahon Aff. Ex. J at P00174.). Thus, McDonald's attempt to change the beneficiary of the Policy could only be effective if he was the Owner of the Policy at the time. The Policy contained the following provision regarding changes to the owner or beneficiary of the policy:

> **Changing the Owner or Beneficiary.** The Owner may change the Owner or any Beneficiary during the Insured's lifetime. To make a change, the Company must receive a written request satisfactory to the Company at its Home Office. Any such change will take effect as of the date the request is signed, even if the Insured dies before the Company receives it. Each change will be subject to any payment the Company made or any other action it took before receiving the request.

(*Id.* at P00175.)

Here, it is clear that McDonald was not the Owner of the Policy at the time he submitted the change of beneficiary form, or at any time thereafter. This follows from the fact that he is not, and never was, "the person who owns this policy, as shown on the Company's records." Although there

6

was an attempt to transfer the Policy to McDonald, the change of ownership form was rejected because it was not satisfactory to the home office. While the reason the request was deemed unsatisfactory may not have been valid, it remains true that McDonald was not the owner of the Policy according to the Company's records. It thus follows that McDonald had no authority to make Hansen the beneficiary of the Policy, and his attempt to do so was ineffective.

Even if the request to transfer ownership had been accepted by Protective, the result would be the same because McDonald gave no consideration to B&K for the transfer of its asset and Culligan had no authority to offer it as a gift. Although the Policy was only effective during the term for which the premium had been paid, it clearly had some value at the time Culligan signed the transfer of ownership form, whether that value was the pro-rated unearned premium amount $217.50 as Hansen suggests (Hansen Reply at 11), or the more speculative value suggested by the Assignee who likens the Policy to a lottery ticket. (Assignee Br. at 2.) Culligan's authority, as manager of the LLC, were explicitly set out in B&K's Operating Agreement. Section 5.3 of the Operating Agreement granted the Manager the authority to, *inter alia*, "buy, sell, and lease Company property in the ordinary course of business . . . ." (B&K PFOF ¶ 30.) He had no authority to give LLC property away, however.

Hansen notes that Wis. Stat. § 183.0702(a) provides that an LLC's manager has authority to transfer company property and Wis. Stat. § 183.0903(2) permits a manager winding up an LLC to take any action to settle and close the business and to dispose and transfer property. Although the statute authorizes managers to transfer property, it nowhere authorizes managers to give property away without any consideration. Further, Culligan's efforts at transferring the policy to McDonald are plainly contrary to Wis. Stat. § 183.0402(1)(c), which prohibits transactions "from which the

7

member or manager derived an improper personal profit." The statute also prohibits any distribution to a member if the LLC is unable to pay its debts, something B&K was clearly unable to do at the time Culligan attempted to transfer ownership of the policy:

> (1) A limited liability company may not declare or make a distribution to any of its members if, after giving effect to the distribution, any of the following would occur:
>
> (a) The limited liability company would be unable to pay its debts as they become due in the usual course of business.

Wis. Stat. § 183.0607(1)(a). Finally, § 183.0905 establishes the priority for distributing the assets of an LLC as it winds up its business. Assets of the LLC must first be distributed to the LLC's creditors, then to the LLC's members, and lastly to former members of the LLC.

Hansen contends that violations of these three provisions of ch. 183 only provide the remedy of an accounting of the value of what is transferred, which according to Hansen is the refundable premium amount of about $217. But if neither Culligan nor McDonald had authority to transfer ownership of the Policy to McDonald without consideration and for his personal purposes, then their attempt to do so in void and of no effect. *Gottsacker v. Monnier*, 2005 WI 69, 281 Wis. 2d 361, 697 N.W.2d 436. The remedy is not an award of damages.

Hansen offers several arguments to support her claim to the proceeds, despite the fact that the transfer of ownership of the Policy to McDonald was never accepted by Protective. She argues first that B&K is estopped from arguing that the change in beneficiary was not effective because B&K, in the person of Culligan, knew that Protective had confirmed the change of beneficiary submitted by McDonald and did not object. She also argues, alternatively, that the policy should be reformed based on mutual mistake. Neither argument has merit.

8

With respect to Hansen's estoppel argument, it should first be noted that Culligan denies that he knew that Protective had accepted McDonald's change of beneficiary. Even if we assume he knew of it, however, Hansen's estoppel claim still fails. "Equitable estoppel is a well-established court-made doctrine that may be applied when an action or non-action by the party against whom estoppel is asserted induces reasonable reliance by the other party, to that party's detriment." *Hocking v. City of Dodgeville*, 2009 WI App 108, ¶ 17, 770 N.W.2d 761 (citation omitted). "[P]roof of estoppel must be clear and convincing, and may not rest upon conjecture." *In re Estate of Alexander*, 75 Wis. 2d 168, 183, 248 N.W.2d 475 (Wis. 1977). Here, while it may be true that McDonald relied upon Protective's confirmation of his change of beneficiary and Culligan's alleged failure to object, there is no evidence that Hansen did.

Hansen also cannot establish the elements needed for reformation of the Policy. Reformation is an equitable remedy to address variance between the actual agreement of the parties and what the parties have reduced to writing. In Wisconsin, reformation of a contract is available on the basis of mutual mistake or mistake on the part of one party and fraud on the part of the other party. *Owen v. Wangerin*, 985 F.2d 312, 316 (7th Cir. 1993); *see also St. Norbert Coll. Found., Inc. v. McCormick*, 81 Wis. 2d 423, 432, 260 N.W.2d 776 (Wis. 1978). The Wisconsin Supreme Court has stated that "to justify reformation the evidence must be clear and convincing that both parties intended to make a different instrument, and must clearly show that both had agreed upon facts which were different than those set forth in the instrument." *Jeske v. Gen. Acc. Fire & Life Assur. Corp.*, 1 Wis. 2d 70, 78, 83 N.W.2d 167 (Wis. 1957). Where reformation is sought, a distinction is made between an ordinary contract and contract of insurance, and less proof is required in cases dealing with the latter. *Id.* at 78-79.

9

Here, both the application for the insurance policy and the policy itself indicated that the beneficiary was B&K Enterprises, Inc. (McMahon Aff. Ex. J at P00003, P00172.) Even if the Court were to reform the insurance contract so that "B&K Enterprises LLC" and not "B&K Enterprises Inc." was the policy owner at the time of the agreement, it does not follow that McDonald is the owner of the policy on a theory that Protective should have accepted the change of ownership form. The policy does not allow for a change of ownership without Protective first receiving a written request satisfactory to it. Protective has not found the Change of Ownership form it received in February 2008 to be satisfactory, and according to its records B&K Enterprises, Inc., remains the owner of the policy. Further, Hansen's contention that there was a mutual mistake as a result of the identification of B&K as a corporation on the Change of Ownership form misses the mark. This is because the efforts of Culligan and McDonald to change the ownership of the policy from B&K to McDonald by submitting the form to Protective is not a written agreement for which equitable reformation is available.

Even aside from failure of proof, however, both arguments are based on equitable principles, and in this case the equities do not lie in Hansen's favor. "[E]ven if a party meets the burden to establish that the elements exist for the equitable relief sought, a court of equity still retains the discretion to grant or deny relief." *Richards v. Land Star Group, Inc.*, 224 Wis. 2d 829, 848, 593 N.W.2d 103, 111 (Ct. App. 1999) (citing *Forest County v. Goode*, 219 Wis. 2d 655, 684, 579 N.W.2d 715, 728 (1998)). This means that a court may deny a request for equitable relief if it concludes from the totality of circumstances that there are compelling equitable reasons to do so. *Id.* Based on the totality of circumstances, I conclude that this is not a case that calls for an exercise of the Court's equitable powers in favor of Hansen.

10

Case 1:08-cv-00312-WCG    Filed 03/31/10   Page 10 of 12   Document 100

B&K was formed as an LLC in order to run a gas station. B&K selected McDonald to oversee the gas station's daily operations. In order to provide skeptical creditors piece of mind, B&K took out an insurance policy on McDonald's life and assigned the proceeds to the creditors, and paid the premiums for over four years, the entire time the policy was in effect. McDonald was inept and even dishonest in operating the business, forcing the other members of the LLC to incur additional liability. B&K removed McDonald from his position of manager and ultimately tapped Culligan, its accountant, to assume the duties of managing the LLC as it wound up its affairs.

Having in the meantime developed a relationship with Hansen, McDonald sought to have ownership of the Policy transferred to him so that he could make her the beneficiary before he killed himself. Hanson had no insurable interest in McDonald's life, and was not financially dependent upon him. Indeed, the relationship between them seemed somewhat troubled by the time McDonald took his life. After telling him to leave her alone, she ignored his continual phone calls during the hours before his death. And while she denies she knew he intended to kill himself, the evidence strongly suggests otherwise. Despite the fact that Hansen had no connection with the business B&K conducted and even though neither she nor McDonald ever paid anything toward the policy premium, she claims a right to the million dollars in the policy's proceeds. On the other hand, various non-member creditors of the now defunct B&K have claims totaling approximately $83,000. Claims of an additional $400,000 have been asserted by the remaining members. Under these circumstances, I decline to exercise the Court's equitable powers in Hansen's favor.

Accordingly, B&K's motion for declaratory relief is granted, and the Court hereby declares that B&K is the lawful beneficiary under the terms of the Policy and, as such, is entitled to the proceeds. The Assignee for the Benefit of Creditors has intervened in order to attempt to void the

11

transfer of the policy to Hansen by B&K as a fraudulent conveyance. Since I have found in favor of B&K on the merits, the Assignee's motion for summary judgment will be denied as moot. Finally, Hansen's motion for summary judgment is denied.

  **SO ORDERED** this  31st  day of March, 2010.

               s/ William C. Griesbach
               William C. Griesbach
               United States District Judge